UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FRUIT STREET HEALTH P.B.C, and<br>LAURENCE N. GIRARD,<br><br>                *Plaintiffs*,<br><br>v.<br><br><br>QUEEN FUNDING, LLC; YEHUDA KLEIN;<br>and JOHN AND JANE DOE INVESTORS,<br><br>                *Defendants*. | Civ. A. No.: |

## COMPLAINT

Plaintiffs, Fruit Street Health PBC ("Fruit Street"), and Laurence N. Girard ("Girard," collectively, "Plaintiffs"), allege as against Defendants, Queen Funding, LLC ("Queen Funding"), Yehuda Klein ("Klein"), and John and Jane Doe Investors (collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This is a RICO action against a merchant cash advance ("MCA") company that is controlled and manipulated by Klein to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from Fruit Street. Queen Funding entered into the so called "Standard Merchant Cash Advance Agreements" (the "Agreements") on August 27, 2020 and May 3, 2021 with Fruit Street pursuant to which it purportedly paid lump sums to purchase Fruit Street's future receipts at a discount and Fruit Street agreed to repay the face value of its receipts through daily payments. *See* **Exhibits A** and **B**, respectively.  While couched as the purchase and sale of future receipts, the Agreements' terms, conditions, and actions of Defendants demonstrate that despite the form the of the Agreements, no sale of receipts ever took place and the form of the Agreements were merely a sham to evade applicable usury laws. In reality, the

Agreements were loans that charged interest rates that exceeded no less than 230%, rates that are far greater than the maximum 25% permitted under New York Penal Law.

2.      It is against this backdrop that Fruit Street files this Complaint.

## THE PARTIES

3.      Plaintiff, Fruit Street Health, is a public benefit corporation duly organized under the laws of Delaware with its principal place of business located in New York, New York.

4.      Plaintiff, Laurence N. Girard, is an individual resident and citizen of New York. Girard is the owner of Fruit Street and provided a personal guaranty for each of the Agreements.

5.      Defendant, Queen Funding, LLC, is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at 122 East 42nd Street, Suite 2112, New York, New York, 10168.

6.      Defendant, Yehuda Klein, is the sole LLC owner of Queen Funding LLC, and is a resident and citizen of New York.

7.      Upon information and belief, each of the John and Jane Doe Investor Defendants is a citizen of New York or New Jersey.

## JURISDICTION

8.      This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeering Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961-68.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

10.     Defendants are subject to the personal jurisdiction of this Court because Defendants have voluntarily subjected themselves to the jurisdiction of this Court; regularly transact business

-2-

within the State of New York, and/or has purposefully availed themselves of the jurisdiction of this Court for the specific transaction at issue.

## FACTUAL ALLEGATIONS

**A.    The Predatory MCA Industry.**

11.    The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[1] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

12.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]  The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."  *Id.*

**B.    The MCA Agreement is Substantively and Procedurally Unconscionable.**

13.     The MCA Agreements entered into by the Plaintiffs are unconscionable contracts of adhesion that were not negotiated at arms-length.

14.    Instead, they contain one-sided terms that prey upon the desperation of businesses and their individual owners and help conceal the fact that the transactions, including these involving Fruit Street, are really loans.

---

[1] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

15.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving Defendants the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the Defendants, (4) a one-sided attorneys' fees provision obligating the merchant to pay the Defendants' attorneys' fees but not the other way around, (5) a personal guarantee, (6) a class action waiver, (7) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (8) the maintenance of business interruption insurance, (9) an assignment of lease of merchant's premises in favor of the Defendants, (10) the right to direct all credit card processing payments to the Defendants, (11) a power-of-attorney "to take any action or execute any instrument or document to settle all obligations due to Queen [Funding], and (12) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due[.]"

**C.      The Defendants Use a Sham Reconciliation Provision to Disguise the Loans.**

16.     In order to evade state usury laws, the Defendants includes sham reconciliation provisions in their Agreements to give the appearance that the loans do not have a definite term.

17.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to see the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

18.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

19.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Defendants falsely represent that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, the Defendants ensures that if sales decrease, the required fixed daily payments remain the same.

20.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

21.     On information and belief, the Defendants do not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

22.     Moreover, the Agreements' reconciliation provisions at issue here are wholly irrelevant as Defendants drafted the Agreements such that they would be under no obligation to reconcile any merchant's payments, including Defendants, if they choose to simply not respond to the reconciliation request.  *See* **Exs. A & B** § 4 ("Merchant may give written notice requesting a reconciliation by e-mail . . . and such notice will be deemed to have been received **if** and when QUEEN sends a reply e-mail (but not a read receipt)") (emphasis added).

23.     The fact that reconciliation would not be acknowledged unless and until Queen Funding responded to the merchant's email is significant because under Defendants' MCA agreements the merchant would be in default for failing to fully pay four (4) daily withdrawals over the term of the loan.  *Id*. § 34(16).

24. Thus, a merchant could easily make a reconciliation request which Queen Funding does not respond to within four days, at which point, the merchant would be in default and the full repayment amount of the MCA Agreement becomes immediately due. *Id*. § 17(f).

25. Moreover, even if Queen Funding responded to the merchant's email and approved the reconciliation, it did not need to credit the merchant's account for another seven (7) days, at which point more than 4 daily fixed withdrawals would already have been processed by Defendants, and if the merchant did not have funds sufficient to cover these payments while its reconciliation request was being processed, it would also be placed into default with full acceleration of the outstanding balance. *Id*. §§ 4, 17(f).

26. Finally, the reconciliation provision in the Agreements also gave Defendants full latitude to deny a reconciliation request if the merchant, such as Plaintiffs, did not supply Defendants with any documents Defendants may request concerning its business, which this District has found renders such reconciliation provisions illusory.

27. In practice, whenever Fruit Street made a reconciliation request, Defendants either (a) ignored the request and/or refused to repay any overcollection or adjust future payments; or (b) only agreed to adjust future payments, with no possibility of Fruit Street being reimbursed for overcollections based on that week's receivables, and these adjustments were made arbitrarily with no attempt by Defendants to actually review Fruit Street's receivables to determine the correct adjustment amount based on the purported percentage of Fruit Street's receivables Defendants purchased.

**D.    The Defendants Intentionally Disguise the True Nature of the Transactions.**

28. Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

-6-

(a)     The daily payments required by the Defendants' MCA agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loans, the purchased amounts were to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amounts.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default and upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)     While the Defendants' MCA agreements purported to "assign" all of the merchant's future account receivables to the Defendants until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Defendants merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

(d)     Unlike true receivable purchase transactions, the Defendants' MCA agreements were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Defendants based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, the Defendants did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the daily payments was determined based upon when the Defendants wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Defendants assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     Defendants required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected Defendants from any risk of loss resulting from the merchant's failure to generate and collect receivables;

30691123v.1

(i)     Defendants required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Defendants knew were breached from day one.

## FACTUAL BACKGROUND

**A.     Fruit Street's Business.**

29.     Fruit Street is a healthcare services provider that delivers the CDC's National Diabetes Prevention Program via telehealth and live group video conferencing with registered dietitians. The program is designed to help 88 million Americans living with prediabetes to avoid developing Type 2 diabetes, an expensive healthcare condition. The National Diabetes Prevention Program has been proven to help individuals with prediabetes reduce their risk for Type 2 diabetes by more than 58% based on Medicare funded research published in the New England Journal of Medicine. Fruit Street is a company owned by more than 500 physicians and is a public benefit corporation focused on having a social impact by improving the health of the public.

30.     As a public benefit corporation Fruit Street, unlike traditional C Corporations whose primary interest is maximizing shareholder value, public health corporations balance stakeholders' pecuniary interests, prioritizes the interests of those who are involved and affected by the corporation (such as employees and customers), as well as the advancement of their intended public benefit goal for improving society.

31.     Fruit Street's clinical outcomes have been endorsed by the Centers for Disease Control & Prevention evidenced by the fact that Fruit Street was awarded full recognition for its outcomes by the CDC. This means that Fruit Street is consistently delivering high quality healthcare outcomes to individuals with prediabetes.

**B.     Fruit Street and the MCA Industry.**

32.     Like many MCA companies, the Defendants prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Although their agreements are titled "Standard Merchant Cash Advance Agreement" and purport to represent the sale/purchase of a businesses' future revenue, Defendants market, underwrite and collect upon their transactions as loans, with interest rates far above those permissible under New York Law.

33.     In their marketing, the Defendants expressly describe the transactions as "loans" and describe themselves as "lenders."

34.     The Defendants also consistently describes their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

35.     The Defendants also show in their underwriting practices that their agreements are loans. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing. When underwriting new transactions, Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

36.     When Defendants collect upon their agreements, they treat them just like loans.  For example, they require the merchant to make fixed daily payments and grant security interests to Defendants in substantially all of the merchant's assets to ensure that the daily payments are made.

37.     Defendants also required the merchant to execute confessions of judgment that Defendants could file if the merchant failed to make as few as two daily payments under its agreements. In other words, Defendants structure the transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

-9-

38.     Fruit Street fell victim to all of these predatory tactics.

**C.     The Defendants Loan to Fruit Street.**

**The August 27, 2020 Loan**

39.     Under the August 27, 2020 agreement, Queen Funding agreed to advance $75,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 6% of Fruit Street's Future Receipts until such time as the amount of $111,750 (the "Purchased Amount") was repaid.  *See* **Ex. A**.

40.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $2,235 (a "Daily Payment") such that the Purchased Amount would be repaid in just 50 days, which on its face, translates into an annual interest rate of more than 240% per annum or more than nine (9) times the maximum 25% rate permitted under New York penal law.

41.     Even worse, Queen Funding did not advance Fruit Street the full Purchased Amount. Instead, Queen Funding charged a fee to cover underwriting and the ACH debit program for a total of $4,125.

42.     While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**The May 3, 2021 Loan**

43.     Under the May 3, 2021 agreement, Queen Funding agreed to advance $100,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 6% of Fruit Street's Future Receipts until such time as the amount of $149,900 (the "Purchased Amount") was repaid.  *See* **Ex. B**.

44.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $2,998 (a "Daily Payment") such that the Purchased Amount would be repaid in just 50 days, which on its face, translates into an annual interest rate of more than 240% per annum or more than nine (9) times the maximum 25% rate permitted under New York penal law.

45.     Even worse, Queen Funding did not advance Fruit Street the full Purchased Amount. Instead, Queen Funding charged a fee to cover underwriting and the ACH debit program for a total of $5,500.

46.     While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**FIRST CAUSE OF ACTION**
**(RICO: 18 U.S.C. § 1962)**

46.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.      The Unlawful Activity.**

47.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

48.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

49.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket (the "Report") brought to the attention of the Governor and the public the need for change in both, as well as for change in the

-11-

immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment.

50.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

51.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

52.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

53.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

54.     Like here, this was a purely artificial device used by the loan shark to evade the law—an evasion that the Legislature sought to prevent.

55.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.     Culpable Persons.**

56.     Klein and the John and Jane Doe Investors are "persons" within  the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property (the "RICO Persons").

57.     At all relevant times, Klein and the John and Jane Doe Investors were, and are, persons that exist separate and distinct from the Enterprise, described below.

30691123v.1

58.     Klein has an ownership interest in Queen Funding and is the mastermind of the Enterprise.

59.     The John and Jane Doe Investors are individuals and business entities that provide funding for the loans.

60.     Through their operation of Queen Funding, the RICO Persons solicit, underwrite, fund, service and collect upon unlawful debt incurred by small businesses in states that do not have usury laws.

**C.     The Enterprise.**

61.     Klein, Queen Funding, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

62.     Klein, Queen Funding, and the John and Jane Doe Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

63.     Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

64.     The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates

applicable criminal usury statutes; and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

**D.     The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

65.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.   Yehuda Klein**

66.     Klein is an owner and the mastermind of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of the John and Jane Doe Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

67.     In his capacity as the mastermind of the Enterprise, Klein is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of the MCA agreements used by the Enterprise to attempt to disguise the unlawful loans as receivables purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Fruit Street.

68.     Klein has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

69.     Klein has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Queen Funding and to his personal bank account(s).

**ii.   Queen Funding**

70.     Queen Funding is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Klein and the John and Jane Doe Investors.

71.      Klein and the John and Jane Doe Investors have operated Queen Funding as part of an unlawful enterprise to collect upon unlawful debt. Pursuant to its membership in the Enterprise, Queen Funding has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of the John and Jane Doe Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called MCA agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments in its name to further collect upon the unlawful debt.

72.     In this case, Queen Funding, through Klein and the John and Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from the John and Jane Doe Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected

-15-

upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Fruit Street.

### iii. The John and Jane Doe Investors.

73.     The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Queen Funding and Klein.

74.     Directly and through their members, agent officers, and/or employees, the John and Jane Doe Investors have been and continue to be responsible for providing Queen Funding with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

75.     The John and Jane Doe Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the John and Jane Doe Investors according to their level of participation in the usurious loans.

### E. Interstate Commerce.

76.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

77.     Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, including Fruit Street, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

-16-

78.     In the present case, all communications and interactions between the members of the Enterprise and Fruit Street were by interstate email and mail, interstate wire transfers or ACH debits and other interstate wire communications.  Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

79.     In addition, at the direction of Defendants, each of the Agreements were executed in states outside of New York, and original copies of the Agreements and applicable Confession Affidavits were sent from New York to the Enterprise, through Defendants, at their offices in New Jersey.

### F.     Injury and Causation.

80.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

81.     The injuries to the Plaintiffs are directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

82.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

83.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

84.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

85.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

86.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

87.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements.

88.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

89.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

90.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

91.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

92.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### THIRD CAUSE OF ACTION
**(In the alternative, Breach of Contract)**

93.     Plaintiffs repeat and re-allege each of the above allegations.

94.     Each of the MCA agreements contained an "Additional Fees" clause setting forth sham fees chargeable to Plaintiffs.

95.     Defendants improperly deducted a fee that comprised of $4,125 for the August 27, 2020 agreement and $5,500 for the May 3, 2021 agreement "to cover underwriting and the ACH debit program, as well as related expenses." This fee was fraudulent as it was simply a ploy to extract additional funds from Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

96.     Defendants also deducted a Wire Fee, a UCC Fee, and a UCC Termination Fee, which were similarly a fraudulent ploy to extract funds from Plaintiffs by using a sham misnomer characterization of fees.

97.     The MCA agreements represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their respective agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreements and the so-called "fees" were nothing more than additional profits reaped by the Enterprise MCA Companies under the MCA agreements.

-19-

98.     For example, each of the MCA agreements provided for a fee "to cover underwriting and the ACH debit program, as well as related expenses." However, the Enterprise MCA Companies performed little or no due diligence and conducted very little underwriting when entertaining into the MCA agreements.

99.     The Enterprise MCA Companies knew that their representations concerning the nature and purpose of the Origination Fee and other fees discussed above were false and misleading at the time they entered into the MCA Agreements.

100.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the amount funded of the MCA Agreements were legitimate fees charged to offset the costs of services provided by the Enterprise MCA Companies under the MCA Agreements.

101.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreements and, ultimately paying the fees through the "Daily Payments."

102.    Under each of the MCA agreements, Defendants promised to advance certain amounts as identified in each of the MCA agreements.

103.    Defendants did not advance the amounts as promised.

104.    Under each of the MCA agreements, Defendants were entitled to debit through ACH withdrawals certain amounts as identified in each of the MCA agreements.

105.    As described in detail above, Defendants debited more than they were entitled to debit under each of the MCA agreements.

106.    As a direct and proximate result of Defendants' breach of each of the MCA agreements, Plaintiffs have been damaged in the amounts described in detail above.

-20-

107.    In the event that the Court finds that each of the MCA agreements are valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of each of the MCA agreements.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a)    Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensation, direct, and consequential damages, including prejudgment interest, in an amount not less than $86,650.00;

c)    Awarding treble damages, including all money, fees and interest wrongfully charged to Plaintiff, in an amount not less than $259,950.00;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.

Dated: September 11, 2023

**WHITE AND WILLIAMS LLP**

By: */s/ Shane R. Heskin*
Shane R. Heskin
1650 Market Street, Suite 1800
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

30691123v.1